CURRIER, J.A.D., dissenting.
Because I find that counsel's failure to object to the testimony of Dr. Goldberg stemmed from a well-founded strategy, and was a tactical decision, I cannot agree with the majority that the testimony was plain error requiring a new trial. I respectfully dissent.
The majority concludes that Dr. Goldberg's reference to a medical study during his direct examination was an "undisclosed material change" in his testimony amounting to plain error and requiring a new trial. I must respectfully disagree as the record reflects that plaintiff's counsel was familiar with the medical study and did not object to its use because the study supported plaintiff's theory of malpractice against the doctor.
In his opening statement, counsel laid the framework for plaintiff's theory of negligence as he educated the jury on the drug prescribed by defendant-Pegasys. He said:
Now, [Pegasys] was being studied at the time in a clinical trial for patients with ET and one other condition. It was being studied, and it's still being studied, the clinical trial ... is still going on as to whether it's a good drug for patients with this condition....
One of the problems with interferon or pegylated interferon, and this is in the manufacturer literature, the drug literature provided by the maker [o]f the drug. It can significantly worsen or aggravate depression in patients who already have depression ....
And in fact, in the clinical trial documents[,] ... [i]f you're a patient with depression, you're excluded from the trial. You cannot be in this clinical trial. It's one of the exclusion criteria for [Pegasys] because of that concern that I said.
Counsel concluded his opening remarks by stating to the jury: "Dr. Goldberg needlessly endangered this patient by prescribing a medication that she had known toxicity to and was contraindicated in patients who have depression. The drug study excludes patients with depression."
*563 That was plaintiff's theory of negligence-Dr. Goldberg should not have prescribed Pegasys to plaintiff with her known history of depression. In doing so, plaintiff asserted the doctor breached or deviated from the standard of care. The medical study at issue here supported that theory. Therefore, rather than objecting to Dr. Goldberg's reference to a study during his direct examination, plaintiff questioned the doctor about the study on cross-examination. Counsel asked: "And the clinical trial that you talked about on direct, 2005 to 2009, done at ... M.D. Anderson, was that for diseases other than ET?" He continued, questioning the doctor about another clinical trial that had commenced in 2010. "[W]as there a clinical study in 2010 for patients with ET ... for Pegasys?" And later, counsel asked: "[y]ou said that in one of the clinical trials, one of the exclusions was major depression ? .... Do you know if in any of the other clinical trials for Pegasys for ET that one of the exclusions is ... depression?"
*274 During a sidebar discussion following an objection, plaintiff's counsel referenced two studies: the 2005 trial discussed by defendant on direct examination, and the 2010 ongoing study. Furthermore, as the majority notes, plaintiff's counsel had specifically asked defendant during his deposition about the 2005 study discussed in the 2009 Journal of Clinical Oncology that excluded patients who had a history of depression. The record reflects that counsel was well aware of the clinical study discussed by defendant and found it helpful to his case. Because both of the studies corroborated plaintiff's theory of negligence, counsel did not object when defendant referred to the 2005 trial during his direct testimony.
On the first day of trial, plaintiff presented a list of in limine motions for the court's determination. Because defendant had not provided any medical literature during discovery, plaintiff moved to bar the use of any literature. The judge agreed and stated: "I'm barring you from using any additional medical literature that has not been provided during the course of discovery." Yet, when defendant mentioned a clinical study during his testimony there *564 was what the majority describes as an "inexplicable" silence. I disagree with that characterization.
A "surprised" attorney would have immediately taken one or several courses of action: object, request the judge implement his pretrial ruling barring the use of medical literature, request a copy of the article to review it, and impeach the doctor with his interrogatory answers and deposition testimony in which he denied reviewing any medical literature. Counsel, however, remained silent, electing instead to cross-examine defendant on the Journal article and 2005 study.
In my view, the majority's reliance on McKenney, 167 N.J. at 359, 771 A.2d 1153, is misplaced. Counsel expressed no surprise upon hearing Dr. Goldberg's testimony. Moreover, because the referenced study supported plaintiff's theory of negligence, the testimony was not prejudicial to her. Defendant was not an expert, as in McKenney, opining as to the standard of care. He was explaining his thought process in his care and treatment of plaintiff and his decision to prescribe Pegasys. The study he referenced was known to plaintiff's counsel, and its exclusion criteria supported plaintiff's theory of negligence. There is no evidence as found by the Court in McKenney that defendant's references to the 2005 study "clearly prejudiced" plaintiff.
While I agree with the majority that defense counsel should have advised plaintiff prior to trial of his intended use of the 2009 Journal article, I cannot conclude that the failure to do so, without objection, requires a new trial. As the majority notes, trial counsel are seasoned veterans, accomplished at fashioning trial tactics and strategies.[1] "The absence of an objection suggests that trial counsel perceived no error or prejudice, and, in any event, prevented the trial judge from remedying any possible confusion in a timely *565 fashion." Bradford v. Kupper Assocs., 283 N.J. Super. 556, 573-74, 662 A.2d 1004 (App. Div. 1995) (citing State v. Macon, 57 N.J. 325, 337, 273 A.2d 1 (1971) ).
We reverse a denial of a motion for a new trial only if "it clearly appears that there was a miscarriage of justice under the law."
*275 Zaman v. Felton, 219 N.J. 199, 214, 98 A.3d 503 (2014) (quoting R. 2:10-1). We do "not disturb the findings of the jury merely because [we might] have found otherwise upon review of the same evidence." Ibid. The question is whether "it clearly appears that there was a miscarriage of justice under the law." Dolson v. Anastasia, 55 N.J. 2, 7, 258 A.2d 706 (1969).
For all of the reasons stated, after twelve days of trial in this complex matter with dueling expert testimony, I cannot agree with the majority that defendant's brief references to a clinical study during his more than four hours of testimony was a clear miscarriage of justice such as to require a reversal of the jury's verdict and a new trial.

During oral argument before this court, plaintiff's counsel confirmed that Dr. Ziv's testimony did not vary from the opinions proffered in her expert reports and elicited during her deposition. He conceded that it was a calculated trial strategy to refrain from objecting to the psychiatrist's testimony.